UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMANDA CLARKE, SARA HIOTT-MILLIS, KATHERINE RAMOS, and TILE WOLFE,

                Plaintiffs,

      -v-

CITY OF NEW YORK; New York City Police Department ("NYPD") CHIEF JOSEPH ESPOSITO; NYPD Officer ("P.O.") PAULO DOMINGUEZ (Shield No. 18292); P.O. ARETHA BLISSETT-SMITH (Shield No. 7457); P.O. JIANREN CHEN (Shield No. 23474); P.O. JOHN DOES 1 through 40; NYPD SUPERVISORY OFFICER JANE ROE (The names John Doe and Jane Roe being fictitious, as the true names and shield numbers are presently unknown), In their individual and official capacities,

                Defendants.

---

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

**13-CV-5303**

---

      "What a huge debt this nation owes to its 'troublemakers.' From Thomas Paine to Martin Luther King, Jr., they have forced us to focus on problems we would prefer to downplay or ignore. Yet it is often only with hindsight that we can distinguish those troublemakers who brought us to our senses from those who were simply…troublemakers. Prudence, and respect for the constitutional rights to free speech and free association, therefore dictate that the legal system cut all non-violent protesters a fair amount of slack." *Garcia v. Bloomberg*, 11-CV-6957 (JSR), 2012 WL 2045756, at *1 (S.D.N.Y. June 7, 2012).

      Plaintiffs AMANDA CLARKE, SARA HIOTT-MILLIS, KATHERINE RAMOS, and TILE WOLFE by their attorney JANE L. MOISAN of Rankin & Taylor, PLLC, hereby state and allege:

## PRELIMINARY STATEMENT

1. This is a civil rights action arising from the New York City Police Department's ("NYPD") unlawful termination of a lawful and peaceful Occupy Wall Street protest at 12th Street between University Place and Fifth Avenue in Manhattan on September 24, 2011.

2. The NYPD and its top supervisory officers conspired to deploy orange netting to trap protesters on the sole basis of their presence within this particular city block, imposing a mass arrest.

3. Plaintiffs had neither warning that their conduct could lead to arrest nor any opportunity to disperse.

4. The NYPD's conduct not only violated the plaintiffs' First Amendment rights to freedom of speech and peaceable assembly, but also instilled fear within the plaintiffs regarding future opportunities to assert their constitutional rights.

5. Plaintiffs AMANDA CLARKE, SARA HIOTT-MILLIS, KATHERINE RAMOS, and TILE WOLFE bring this action to vindicate their rights under the First, Fourth and Fourteenth Amendments of the Constitution of the United States, through the Civil Rights Act of 1871, as amended, codified as 42 U.S.C. § 1983.

6. Plaintiffs seek an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343 (3-4). This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of plaintiffs' rights under the First, Fourth and Fourteenth Amendments to the Constitution of the United States.

8. Venue is proper pursuant to 28 U.S.C. § 1391 in that plaintiffs' claims arose in the Southern District of New York.

9. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

10. Plaintiffs AMANDA CLARKE ("CLARKE"), SARA HIOTT-MILLIS ("HIOTT-MILLIS"), and TILE WOLFE ("WOLFE") were at all times relevant to this action, residents of the State of New York.

11. Plaintiff KATHERINE RAMOS ("RAMOS") was at all times relevant to this action, a resident of the State of New Jersey.

12. Defendant CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by NYPD.

13. Defendant NYPD Chief JOSEPH ESPOSITO ("ESPOSITO") was at all times the Chief of the NYPD and was responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and/or customs complained of herein. He is sued in his individual and official capacities.

14. Defendants NYPD Officer ("P.O.") PAULO DOMINGUEZ ("DOMINGUEZ"), P.O. ARETHA BLISSETT-SMITH ("BLISSETT-SMITH"), P.O. JIANREN CHEN ("CHEN"), P.O. JOHN DOES 1 through 40, and SUPERVISORY OFFICER JANE ROE (referred to collectively as the "officer defendants") are and were at all times relevant herein, officers,

employees and/or agents of the NYPD. The officer defendants are being sued herein in their individual capacities.

15. At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

16. The true names and shield numbers of defendants P.O. JOHN DOES 1 through 40 and SUPERVISORY OFFICER JANE ROE, are not currently known to the plaintiffs. However, all of said defendants are employees or agents of the NYPD. Accordingly, said defendants are entitled to representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to New York General Municipal Law § 50-E. The Law Department, then, is hereby put on notice (a) that plaintiffs intend to name said officers as defendants in an amended pleading once their true names and shield numbers become known to plaintiffs, and (b) that the Law Department should immediately begin preparing their defense in this action.

## STATEMENT OF FACTS

17. The events herein complained of occurred principally on 12th Street between University Place and 5th Avenue in Manhattan, near Union Square, on September 24, 2011 at approximately 3:00 p.m. and thereafter.

18. At approximately 12:00 p.m., the march commenced, leaving Liberty Plaza and heading north up Broadway towards Union Square.

19. Upon information and belief, at approximately 12:00 p.m. on September 24, 2011, in the vicinity of Union Square, officers of the NYPD and the officer defendants, were deployed to the site of protected First Amendment activity – a demonstration of at least a thousand people organized as Occupy Wall Street protesters.

20. Upon information and belief, all plaintiffs were part of the march when it arrived in Union Square at approximately 2:00 p.m.

21. Upon information and belief, while plaintiffs and other demonstrators were inside Union Square, NYPD officers deployed orange netting across 14th Street, the southern boundary of the park.

22. Upon information and belief, pursuant to customary practice and judicial order, defendant ESPOSITO would have to have received notice of, and given consent for, the use of orange nets to stop, re-route and/or detain persons participating in the march. In other words, upon information and belief, defendant ESPOSITO personally authorized the use of orange netting against demonstrators in and around Union Square Park.

23. Plaintiffs then walked south on University Place toward 12th Street with a group of other demonstrators.

24. Upon information and belief, as plaintiffs each turned the corner of 12th Street and University Place and walked west approximately 100 feet, defendants police officers JOHN DOES 1 through 9 became visible to them at the other end of the block at 5th Avenue and 12th Street.

25. Upon information and belief, plaintiff RAMOS was directed by the officer defendants to exit the block to the east, via University Place.

26. Upon information and belief, defendant SUPERVISORY OFFICER JANE ROE told plaintiffs CLARKE, HIOTT-MILLIS and WOLFE, in sum and substance, "STAY ON THE SIDEWALK AND YOU WON'T GET ARRESTED."

27. Upon information and belief, at approximately 2:30 p.m., defendants JOHN DOES 10 through 16 then deployed orange netting to block any possible exit from the east side of 12th Street, trapping plaintiffs and other demonstrators.

28. Plaintiffs attempted exiting at both sides, but the officer defendants barred exit.

29. The officer defendants then ordered plaintiffs - and approximately 100 other demonstrators arbitrarily trapped on the block between University Place and 5th Avenue - to stand against the building walls on the south side of the sidewalk.

30. The officer defendants then placed everyone in handcuffs and forced the group, including plaintiffs, to kneel and face the wall for approximately a half an hour.

31. Plaintiffs were placed on buses and vans and ultimately transported to the NYPD First Precinct Office.

**Plaintiff Clarke**

32. Plaintiff CLARKE was issued a desk appearance ticket and released from the NYPD precinct office at approximately 1:00 a.m. on September 25, 2011.

33. Plaintiff CLARKE was falsely charged under Docket Number 2011NY077655 with two counts of Disorderly Conduct, P.L. 240.20 subsection 5 and 6.

34. The criminal court complaint charging plaintiff CLARKE was falsely sworn to by defendant P.O. JIANREN CHEN.

6

35. Plaintiff CLARKE appeared on November 3, 2011 and was released upon her own recognizance with an adjournment date of January 9, 2012.

36. As a result of this incident, plaintiff CLARKE was required to and appeared on January 9, 2012, April 18, 2012, on April 20, 2012, and again on October 19, 2012. On October 19, 2012, the case against her was dismissed and sealed.

37. Plaintiff CLARKE missed school and work as a result of the arrest and repeated appearances, and suffered from tingling and soreness of her wrists for approximately one week as a result of the excessive force used in handcuffing her.

38. Plaintiff CLARKE has suffered garden variety emotional and psychological injuries as result of the incident, as well as lost earnings.

**Plaintiff Hiott-Millis**

39. Plaintiff HIOTT-MILLIS was issued a desk appearance ticket and released from the NYPD precinct office at approximately 1:00 a.m. on September 25, 2011.

40. Plaintiff HIOTT-MILLIS was charged under Docket Number 2011NY075091 with two counts of Disorderly Conduct, P.L. 240.20 subsection 5 and 6.

41. The criminal court complaint charging plaintiff HIOTT-MILLIS was falsely sworn to by defendant P.O. ARETHA BLISSETT-SMITH.

42. Plaintiff HIOTT-MILLIS appeared on November 3, 2011 and January 9, 2012.

43. At plaintiff HIOTT-MILLIS' January 9, 2012 appearance, the case against her was dismissed and sealed.

44. Plaintiff HIOTT-MILLIS missed school and work as a result of the arrest and appearances and suffered from soreness of her wrists as a result of the excessive force used in handcuffing her.

45. Plaintiff HIOTT-MILLIS has suffered garden variety emotional and psychological harms as result of the incident, including diminished ability to avail herself of the assistance of law enforcement officers and exercise her First Amendment rights.

**Plaintiff Ramos**

46. Plaintiff RAMOS was issued a desk appearance ticket and released from the NYPD precinct office at approximately 1:00 a.m. on September 25, 2011.

47. Plaintiff RAMOS was falsely charged under Docket Number 2011NY077657 with Disorderly Conduct, P.L. 240.20 subsection 5.

48. The criminal court complaint charging plaintiff RAMOS was falsely sworn to by defendant P.O. JIANREN CHEN.

49. Plaintiff RAMOS appeared on November 3, 2011, January 9, 2012, October 23, 2012 and January 14, 2013 and March 7, 2013, when the People conceded dismissal on grounds of C.P.L. § 30.30.

50. Plaintiff RAMOS missed multiple days of work leading to lost earnings as a result of the arrest and appearances, and suffered from soreness of her wrists and physical injury as a result of the excessive force used in handcuffing and detaining her.

51. Plaintiff RAMOS has suffered garden variety emotional and psychological harms as result of the incident.

**Plaintiff Wolfe**

52. Plaintiff WOLFE was issued a desk appearance ticket and released from the NYPD precinct office at approximately 2:00 a.m. on September 25, 2011.

53. Plaintiff WOLFE was falsely charged under Docket Number 2011NY075091 with two counts of Disorderly Conduct, P.L. 240.20 subsection 5 and 6.

54. The criminal court complaint charging plaintiff WOLFE was falsely sworn to by defendant P.O. PAULO DOMINGUEZ.

55. Plaintiff WOLFE appeared on November 3, 2011 and January 9, 2012.

56. At plaintiff WOLFE's January 9, 2012 appearance, the case against her was dismissed and sealed.

57. Plaintiff WOLFE missed work due to the incident and appearances, and has suffered mental health injuries, including the inability to avail herself of assistance from officers of the peace.

**FIRST CLAIM**
**DEPRIVATION OF RIGHTS**
**UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**

58. Plaintiffs AMANDA CLARKE, SARA HIOTT-MILLIS, KATHERINE RAMOS, and TILE WOLFE incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

59. Defendants, under color of state law, subjected plaintiffs to the foregoing acts and omissions without due process of law and in violation of the rights, privileges and immunities secured by the First, Fourth and Fourteenth Amendments to the United States Constitution through 42 U.S.C. § 1983, including, without limitation, deprivation of the following constitutional rights:

    a.  freedom from unreasonable seizure, including the excessive use of force;

    b.  freedom from unlawful detention, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiffs were aware and did not consent;

    c.  freedom from interference with protected First Amendment activity;

    d.  freedom from retaliatory use of force;

    e.   freedom from abuse of process; and

    f.   freedom from deprivation of liberty without due process of law.

60. Defendants' deprivation of plaintiffs' constitutional rights resulted in the injuries and damages set forth above.

**SECOND CLAIM**
**<u>FAILURE TO INTERVENE – FOURTH AMENDMENT – 42 U.S.C. § 1983</u>**

61. Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

62. Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the NYPD or other law enforcement agency employing unjustified and excessive force against a civilian or falsely arresting a civilian.

63. The officer defendants, working as a unit, were present for the above-described incidents and witnessed other officer defendants, <u>to wit</u>, unlawfully detain plaintiffs and use unlawful force against them.

64. The officer defendants' unreasonable detention and uses of force against plaintiffs were obviously excessive and unjustified under the circumstances yet none of the officer defendants took any action or made any effort to intervene, halt or protect the plaintiffs from being subjected to excessive force by other individual defendants.

65. The officer defendants' violations of plaintiffs' constitutional rights by failing to intervene in other defendants' clearly unconstitutional detention and use of force resulted in the injuries and damages set forth above.

## THIRD CLAIM
## _MONELL_ CLAIM AGAINST DEFENDANT CITY – 42 U.S.C. § 1983

66. Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

67. All of the acts and omissions by the named and unnamed individual defendants described above were carried out pursuant to overlapping policies and practices of defendant CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of defendant CITY and its agency, the NYPD.

68. Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

69. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of defendant CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

70. The aforementioned customs, practices, procedures and rules of defendant CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

   a. Using excessive force on civilians;

   b. Falsely swearing out criminal complaints and/or lying and committing perjury during sworn testimony in order to protect other officers;

   c. Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct; and

   d. Discouraging police officers from reporting the corrupt or unlawful acts of other police officers and retaliating against officers who report police misconduct.

71. The aforementioned customs, practices, procedures and rules of defendant CITY and the NYPD include, but are not limited to, the unconstitutional policy, practice, or custom of conducting mass arrests at public events and First Amendment protected activity (whether they be spontaneous, permitted, or otherwise) without making individualized determinations of probable cause or reasonable suspicion.

72. This policy, practice or custom of conducting mass arrests at public events without making individualized determinations of probable cause or reasonable suspicion manifests itself in many forms, including but not limited to the following:

   a. Failing to supervise, train, instruct and discipline police officers concerning how to make individualized determinations of probable cause and/or reasonable suspicion at public events (whether they be spontaneous, permitted, or otherwise) and/or while making mass arrests at demonstrations or otherwise; and

   b. Discouraging police officers from reporting the corrupt or unlawful acts of other police officers, and/or discouraging officers from failure to intervene to prevent same.

73. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against defendant CITY:

   a. Berg v. Kelly, 12-CV-3391, (TPG) (S.D.N.Y.) (NYPD officers detain approximately 100 "Occupy" demonstrators for two hours against their will on November 30, 2011 inside a pen built of interlocking metal barricades and then release them without charges);

   b. Garcia v. Bloomberg, 11-CV-6957 (JSR) (S.D.N.Y.) (NYPD arrest 700 "Occupy" demonstrators on the Brooklyn Bridge on October 1, 2011, for the simple act of walking on the bridge in what appeared to participants to be an action sanctioned by police present at the time);

   c. Stauber v. City of New York, 03-CV-9162 (RWS) (S.D.N.Y.) (NYPD was ordered to amend their Patrol Guide to require the NYPD to allow demonstrators access in and out of police barriers, such as orange netting, during demonstrations);

d. <u>Osterhoudt v. City of New York</u>, 10-CV-3173 (RJD), 2012WL4481927 (E.D.N.Y. September 27, 2012) (Judge Dearie denied the City of New York's motion to dismiss parts (a) and (b) of this Monell claim by stating, "Should such a de facto policy or practice of mass arrests exist, it will not likely be shown by direct evidence… Sensitive to this formidable hurdle, I too conclude that plaintiff has 'nudged [his] claims across the line from conceivable to plausible.");

e. <u>Lin v. City of New York</u>, 09-CV-936 (PGG) (S.D.N.Y.) (officers arrest <u>en masse</u> participants in a Critical Mass group bicycle ride, without individualized suspicion, including person lawfully photographing an arrest of a bicyclist in Times Square and a bystander after refusing an unlawful order to produce identification);[1]

f. <u>Colon v. City of New York</u>, 09-CV-00008 (E.D.N.Y. 2012): In an Order dated November 25, 2009 (DE 36), which denied the City of New York's motion to dismiss on <u>Iqbal</u>/<u>Twombly</u> grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

g. <u>Callaghan v. City of New York</u>, 07-CV-9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and mass retaliatory arrests of bicyclists, not based upon individualized suspicion, engaged in expressive conduct, <u>to wit</u>, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);

h. <u>Allen v. City of New York</u>, 03-CV-2829 (KMW) (GWG) (S.D.N.Y.) (police surround and arrest groups of persons lawfully protesting against the policies of the World Economic Forum, without first making individualized determinations of suspicion);

74. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to discouraging police officers from reporting the corrupt or unlawful acts of**

---

[1]   For a description of this case and settlement, *see*, Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists*, N.Y. Times, March 30, 2010, *available at* http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.

**other police officers, and/or discouraging officers from intervening to prevent same** are further evidenced, <u>inter alia</u>, by the following:

a. <u>Lotorto v. City of New York</u>, 10-CV-1223 (ILG) (JMA) (E.D.N.Y.) (police officers beat, arrest and destroy a video recording of a bystander who was recording an arrest occurring in public);

b. <u>Long v. City of New York</u>, 09-CV-9216 (AKH) (S.D.N.Y.); <u>People v. Pogan</u>, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and used excessive force is convicted of falsifying police records and was prosecuted for recklessly using physical force);

c. <u>Colon v. City of New York</u>, 09-CV-0008 (E.D.N.Y.)   In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on <u>Iqbal</u>/<u>Twombly</u> grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department.  Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

d. <u>Carmody v. City of New York</u>, 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of a hostile work environment);

e. <u>McMillan v. City of New York</u>, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

f. <u>Avent v. City of New York</u>, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

g. <u>Smith v. City of New York</u>, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

h. Powers v. City of New York, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

i. Richardson v. City of New York, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

j. Barry v. New York City Police Department, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

k. Walton v. Safir, 99-CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of Amadou Diallo);

l. White-Ruiz v. City of New York, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

m. Ariza v. City of New York, 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department); and

n. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of

such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[2]

o. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

p. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in <u>Colon v. City of New York</u>, 09-CV-00008 (E.D.N.Y. 2012), in which he noted a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, Commissioner Raymond Kelly acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[3]

q. Regarding defendant CITY's tacit condoning of and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a city agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[4] When it does, however, Police Commissioner Kelly controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during Commissioner Kelly's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (<u>i.e.</u>, closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[5] As a result, the

---

[2]     Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/ 4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[3]     Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[4]     In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%). *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted <u>de facto</u> policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, <u>inter alia</u>, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[5]     Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[6]

75. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, <u>inter alia</u>, by the following:

    a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system.  It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[7]
>
> […]
>
> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful.  As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets.  This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that?  They're guilty."[8]

---

[6]    Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

[7]    Mollen Commission Report, p. 36.

[8]    Mollen Commission Report, pp. 40-41.

b. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[9]  Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

> That's a significant increase over previous years, sources said.
> "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

> Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[10]

c. In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel.  Mr. Kim was convicted of those offenses.  The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids."  The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest.  According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[11]

[9]     Murray Weiss, *NYPD in a Liar Storm*, New York Post, October 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

[10]    *Id*.

[11]    John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/2008-06-20_claims_of_corruption_at_queens_precinct_.html.

    d.   The City of New York recently settled a civil rights lawsuit wherein one Officer Sean Spencer[12] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000.  In court documents, Caroline Chen, the attorney representing the City in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."  According to the attorney for the Patrolmen's Benevolent Association, disciplinary charges against the officer are pending.[13]

    e.   Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports.  District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[14]

76. The existence of the above-described unlawful de facto policies and/or well-settled and

widespread customs and practices is known to, encouraged and/or condoned by supervisory

and policy-making officer and officials of the NYPD and defendant City.

77. The actions of the individual defendants resulted from and were taken pursuant to the above-

mentioned de facto policies and/or well-settled and widespread customs and practices of

defendant CITY, which are implemented by members of the NYPD, of engaging in

systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations

committed against civilians by either themselves of their fellow officers, supervisors and/or

subordinates. They do so with the knowledge and approval of their supervisors, commanders

---

[12]    In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, available at http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_ out_35g_to_granny_busted_as_hooker.html.

[13]    *Id*.

[14]    David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

and Commissioner Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

78. All of the foregoing acts by defendants deprived the plaintiffs of federally protected rights.

79. Defendant CITY knew or should have known that the acts alleged herein would deprive the plaintiffs of their rights, in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution.

80. Defendant CITY is directly liable and responsible for the acts of the individual defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the City of New York and NYPD, and to require compliance with the Constitution and laws of the United States.

81. Despite knowledge of such unlawful de facto policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and defendant CITY have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their

authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

82. The aforementioned City of New York policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned policies, practices and/or customs, the individual defendants felt empowered to unreasonably seize, detain, and arrest plaintiffs without reasonable suspicion or probable cause and then fabricate and swear to a false story to cover up blatant violations of plaintiffs' constitutional rights.

83. Plaintiffs injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

84. Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of plaintiffs' constitutional rights.

## **JURY DEMAND**

85. Plaintiffs demand a trial by jury in this action on each and every one of his damage claims.

**WHEREFORE** plaintiffs demand judgment against the defendants individually and jointly and pray for relief as follows:

a.   That they be compensated for violation of his constitutional rights, pain, suffering, mental anguish, and humiliation; and

21

b.      That they be awarded punitive damages against the individual defendants; and

c.      That they be compensated for attorneys' fees and the costs and disbursements of this action; and

d.      That the Court issue a declaration that the NYPD's current practice of using excessive force against individuals at demonstrations is in violation of plaintiffs' First and Fourth Amendment rights; and

e.      Granting permanent injunctive relief requiring defendant CITY to:

    i.      Create an official policy governing the handling of public demonstrations and in particular the use of force against demonstrators that meets U.S. constitutional standards;

    ii.     Effectively implement that policy by training NYPD officers to follow the Demonstration and Use of Force Policy;

    iii.    Provide adequate supervision and enforcement to be sure that the Demonstration and Use of Force Policy is followed;

    iv.     Create and fully implement reporting systems adequate to document all uses of force by the NYPD; and

    v.      Institute an effective mechanism for civilians to file complaints; and

f.      Retaining jurisdiction over the case to ensure that the NYPD complies with the Court's Order; and

g.      For such other further and different relief as to the Court may seem just and proper.

Dated:   New York, NY
         August 12, 2013

                                Respectfully submitted,

                                        /s/
                        By:     _____
                                Jane L. Moisan
                                Rankin & Taylor, PLLC
                                *Attorneys for the Plaintiff*
                                11 Park Place, Suite 914
                                New York, NY 10007
                                t: 212-226-4507